IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

RYAN SCOTT BURKE,                                    Case No. 6:21-cv-00852-MC

           Plaintiff,                                    OPINION AND ORDER

       v.

OREGON DEPARTMENT OF
CORRECTIONS and STATE OF OREGON;
DONALD GOLDEN; MICHAEL YODER;
BRENT ERIKSEN; MARCIA VENTURA;
TANYA WELEBER; and BRYAN
SUNDQUIST,

           Defendants.

_____

MCSHANE, Judge:

     Plaintiff Ryan Scott Burke brings this action against Defendants Donald Golden, Michael

Yoder, Brent Eriksen, Marcia Ventura, Tanya Weleber, Bryan Sundquist, the Oregon Department

of Corrections, and the State of Oregon. Pl.'s Resp. 1, ECF No. 67.[1] Mr. Burke brings claims under

---

[1] Plaintiff originally named Karen Rhoades as a defendant, alleging that she is an Oregon State Penitentiary Behavioral Health Services Counselor. Compl. 3, ECF No. 1. In his original Complaint, Plaintiff referenced Rhoades but did not

Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and 42 U.S.C. § 1983. *Id.* at 2. Before the Court is Defendants' Motion for Summary Judgment. Defs.' Mot. Summ. J., ECF No. 56 ("Defs.' Mot."). Because Plaintiff cannot prevail on his Due Process claims against Defendants Eriksen and Yoder, Defendants Motion is GRANTED for those claims. For the same reason, Defendant's Motion is GRANTED as to Plaintiff's Retaliation claim against Defendant Weleber. Because genuine issues of material fact exist for resolution, Defendants' Motion is DENIED as to the remaining claims.

## BACKGROUND

Plaintiff was diagnosed with Stickler's syndrome—a genetic condition causing hearing impairment, vision impairment, and connective tissue degeneration—at birth. FAC ¶ 5. Plaintiff has been in the custody of the Oregon Department of Corrections ("ODOC") at the Oregon State Penitentiary ("OSP") since 2007. First Am. Compl. ("FAC") ¶ 17, ECF No. 16; Answer Am. Compl. ¶ 18, ECF No. 24. During his prison intake process, ODOC noted Plaintiff's Stickler's syndrome diagnosis. Edwards Decl. Ex. 1, at 1, ECF No. 69. His vision was documented as 20/70 and 20/400 vision. *Id.* at 2–3. "Hearing Aid – Tone Deaf" was also noted on the physical examination form. *Id.* at 2. Plaintiff states that his hearing is tonally and volume deficient; solely raising the volume does not adequately address his hearing difficulties. Burke Decl. ¶ 4, ECF No. 68. Despite knowledge of Plaintiff's condition upon intake in 2007, ODOC failed to offer Plaintiff a disability needs assessment to determine whether he requires accommodations. *Id.* at ¶¶ 5–6. A hearing test administered in 2021 showed that Plaintiff suffers from "a mild loss in the low

---

alle any claims against her. *See id.* at 11–17. In his First Amended Complaint, which is operative here, Plaintiff neither lists Rhoades as a defendant nor brings claims against her. *See* First Am. Compl., ECF No. 16. Accordingly, Defendant Rhoades is DISMISSED as a party from this case.

frequencies sloping to a severe loss in the high frequencies in both ears," and provided that he is a candidate for hearing aids. Aggrey Decl. Ex. 106, at 1.

In June 2019, Plaintiff was charged with Compromising an Employee and Disrespect II. Aggrey Decl. Ex. 101, at 1. The charges arose out of an incident where a Post-It note written by Plaintiff was found on a female prison staff member's desk. *Id*. The disciplinary report states that the note contained a "poem" alluding to a romantic date. *Id*. Mr. Powers, the ODOC employee who discovered the note, asked Plaintiff if he had written the poem. *Id*. Plaintiff "frowned appearing confused and said, 'I don't know what you are talking about.'" *Id*. Plaintiff alleges that he authored the note as a part of a series of riddles intended for the amusement of himself and a fellow inmate, not as a romantic advance on the prison staff member. Pl.'s Resp. 4–5; Burke Decl. ¶ 11. Plaintiff further contends that when confronted, Plaintiff misheard Mr. Powers, thinking he was being asked about a "phone" rather than a "poem." Burke Decl. ¶ 11.

During the related disciplinary hearing, Plaintiff was enclosed in a plexiglass cage. Edwards Decl. Ex. 3, at 49–50. Plaintiff alerted ODOC staff at the start of the hearing about his poor vision and hearing. *Id*. at Ex. 2, at 51. He asked Defendant Golden, the presiding hearing officer, to speak slower and louder given his sensory difficulties. *Id*. Mr. Golden obliged and asked Plaintiff to interject if he was unable to hear. *Id*. at Ex. 3, at 48. Mr. Golden claims that Plaintiff acknowledged and understood him, and did not ask Mr. Golden to raise his voice for the rest of the hearing. *Id*. at 48–49.

Additionally, when presented a pre-prepared statement to read, Plaintiff asked Mr. Golden to hold it against the glass so it would be within a close enough proximity for Plaintiff's vision. *Id*. at 49; *Id*. at Ex. 2, at 53. Defendant Nofziger, who reviewed a recording of the hearing, estimated

3

that Plaintiff must have been two to three feet away from the glass. *Id.* at 50–51. Mr. Golden estimated that the paper was less than five feet from Plaintiff. *Id.* at 57.

Mr. Golden found Plaintiff liable for the charges and imposed 90 days of disciplinary segregation, loss of privileges, and a $100 fine as penalty. Aggrey Decl. Ex. 101, at 2–3. Resultantly, Plaintiff's incentive level dropped, causing him to lose access to incentive-related privileges and programming. *Id.* at Ex. 105, at 2. Plaintiff alleges he was unable to meaningfully participate in the hearing "because [he] could not understand everything being said to [him] [by Mr. Golden]. . . .[so] [Plaintiff] had to guess about part of what was being said in the hearings." Burke Decl. ¶ 10.

On May 1, 2019, ODOC employees intercepted a greeting card containing a controlled substance that was addressed to Plaintiff. Aggrey Decl. Ex. 102, at 1. Plaintiff was charged with Drug Possession. *Id.* at 3. A disciplinary hearing was initiated months later on September 10. *Id.* Plaintiff alleges that he could not fully understand the proceeding for the same sensory reasons as the first proceeding. Burke Decl. ¶ 10. Mr. Golden again found Plaintiff liable and sanctioned him with an additional 90 days in disciplinary segregation, loss of privileges, and a $200 fine. *Id.* at 3. A written misconduct report on the incident was delivered to Plaintiff only after the hearing. *Id.* at ¶ 12.

While in disciplinary segregation, Plaintiff slept on a severely worn-out mattress without pillows, lacked a hearing amplifier, and had his supportive orthotic shoes confiscated. *Id.* at ¶¶ 13–14. He alleges that these conditions exacerbated the pain he experiences from his Stickler's syndrome. *Id.* at ¶ 13. He further alleges that the conditions of his disciplinary hearings and subsequent segregation caused him severe anxiety and depression. *Id.* at ¶ 15. Plaintiff filed many

grievances while in disciplinary segregation because he felt like he "could not fully or properly explain [him]self during the hearings. *Id.* at ¶ 16.

In response to Plaintiff's complaints, Ms. Nofziger reviewed the audio from both hearings. Edwards Decl. Ex. 2, at 40, 46. Ms. Marica Ventura, the AIC (adult in custody) ADA program manager, also reviewed the hearings. *Id.* at 28, 40, 75–76. Ms. Nofziger summarized her and Ms. Ventura's findings as to whether Plaintiff could meaningfully engage with the hearings:

> [Plaintiff] was able to engage 100 percent in his hearing with no difficulty, as can be told by listening to the audio. . . . He was able to read his statement from a distance of several feet accurately. He was able to answer all of the questions that were asked of him. He was able to respond appropriately to all of the questions that were asked of him. . . . He answered [the questions] in a way that clearly showed he understood the questions. . . . He did read his statement without any stammers, without any stutters, without ever saying I'm struggling to see. He was able to read it through in its entirety.

*Id.* at 54; *see also id.* at 76. Upon review of the record, Ms. Nofziger overturned Plaintiff's drug conviction for lack of evidence after Plaintiff had already served 30 days in disciplinary segregation for that charge. *Id.* at 77–78; Burke Decl. ¶ 12. Ms. Nofzinger upheld the conviction relating to the Post-It note incident. Edwards Decl. Ex 2, at 41–42.

## LEGAL STANDARD

On a motion for summary judgment, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## DISCUSSION

### I. Plaintiff's ADA and Section 504 Rehabilitation Act Claims:

Plaintiff brings ADA and Rehabilitation Act claims against ODOC. He also seeks monetary damages under the statutes. Because the elements of Plaintiff's ADA and Rehabilitation Act claims do not differ in any meaningful way for the purposes of this opinion, the Court addresses these claims together. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1135–36 (9th Cir. 2001).

### A. ADA and Rehabilitation Act Claim

#### i. Standard

For Plaintiff to prove that ODOC violated Title II of the ADA, he must show that:

> (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Id.* at 1135 (quoting *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).

6

Similarly, "[a] Rehabilitation Act claim requires a showing that (1) the plaintiff is an individual with a disability; (2) []he is otherwise qualified to receive the benefit; (3) []he was denied the benefits of the program solely by reason of h[is] disability; and (4) the program receives federal financial assistance." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020) (citing *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017), cert. denied, 139 S. Ct. 55, 202 (2018)).

It is undisputed that Plaintiff is a qualified individual with a disability, satisfying the first element of both claims. There is also no dispute that ODOC receives federal funding, satisfying the fourth element of Plaintiff's Rehabilitation Act claim. However, the parties dispute whether Plaintiff was denied the benefits of ODOC's services due to his disability, relating to the second and third elements of each claim.

## ii. Whether Plaintiff was denied the benefits of a public program presents questions of fact

Plaintiff alleges that he was denied the benefits of a meaningful disciplinary process and incentive-related programming. Both disciplinary hearings and incentive-related programs at prisons are among the services, programs, and activities protected by the ADA. *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996) (citing *Bonner v. Lewis*, 857 F.2d 559, 563 (9th Cir. 1998) (disciplinary hearings are "programs" under the ADA and Rehabilitation Act); *Pennsylvania Dept. of Corrections v. Yeskey*, 534 U.S. 206, 210 (1998) (explaining that a prison's "recreational activities, medical services, and educational and vocational programs" are not distinguishable from any other public entity's programs, services, and activities for the purposes of the ADA). Defendants do not contest that Plaintiff was deprived of incentive-related programming. They do, however, argue that Plaintiff was provided a meaningful disciplinary process. Because Defendants

have not definitively shown that Plaintiff was afforded the full benefits of a disciplinary process, questions of fact exist. It remains disputed whether (1) Defendants provided Plaintiff with reasonable accommodations, and (2) Plaintiff understood and meaningfully participated in the proceedings.

Defendants have not shown that they provided Plaintiff reasonable accommodations for his hearing and sight during the disciplinary hearings. Public entities have a duty to ensure that communications with a disabled individual are "as effective as communications with others." 28 CFR § 35.160(a)(1). A reasonable trier of fact could find that ODOC fell short of this requirement when it confined a person who has difficulty hearing and seeing in a glass box and provided no "accommodations" beyond raised voices and a paper held against the glass. Edwards Decl. Ex. 3, at 48–50 (describing the plexiglass enclosure and how a statement was held up for Plaintiff); Edwards Decl. Ex. 2, at 62 (noting that AICs in hearings are "handcuffed usually behind their back"). Other possible accommodations seem to have been both reasonable and available, including providing a hearing amplifier, uncuffing Plaintiff to allow him to hold his statement closer to his eyes, or postponing the hearing to more thoroughly determine what accommodations need to be provided. Edwards Decl. Ex. 3, at 44, 47–48; *Id.* at Ex. 2, at 62.

Defendants have also not shown that Plaintiff understood and was able to fully engage in the hearings. Defendants point to Ms. Nofziger's and Ms. Ventura's determinations that Plaintiff was able to meaningfully engage in the process. However, Plaintiff alleges he "was not able to fully participate in the disciplinary hearings . . . because [he] could not understand everything being said to [him]." Burke Decl. ¶ 10. Settling a conflict between self-serving narratives is a task

particularly suitable for a trier of fact, especially concerning the facially troubling circumstances of the hearings.

### iii. Whether Plaintiff was denied the benefits of a public program "by reason of disability" remains a question of fact

Plaintiff has shown that he could meet either standard under his disciplinary hearing and incentive-related programming theories. The ADA's "by reason of disability" standard demands but-for causation: a plaintiff must show that, but-for their disability, they would not have been excluded from benefits of a public program. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1106 (9th Cir. 2019). "[A] but-for test directs [the Court] to change one thing at a time and see if the outcome changes." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). If the outcome does change, then there is but-for causation. *Id.* The Rehabilitation Act uses a heightened standard, requiring Plaintiff to show that he was "denied the benefits of the program *solely* by reason of h[is] disability[.]" *Schmitt*, 965 F.3d at 954 (emphasis added) (citing *Updike*, 870 F.3d at 949); *K.M. ex rel. Bright v. Tustin Unified School Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013). "A failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). In light favorable to Plaintiff, but-for his disability he would not have been excluded from the benefit of a meaningful hearing. If he had been able to fully participate in the hearings, Plaintiff continues, he would not have been disciplined in the way he was. A trier of fact should discern whether Plaintiff was unable to fully understand the proceedings due to his disability. If so, a but-for cause exists connecting Plaintiff's disability and the deprivation of an equal opportunity to defend himself. Regarding the Rehabilitation Act standard, it is possible that Plaintiff's disability was the *sole* reason for his exclusion. Assuming

that Plaintiff was excluded from meaningful participation in the hearings, Defendants have not shown that some other factor contributed to Plaintiff's exclusion—his disability could have been the only cause.

Defendants are also unconvincing in their effort to assert no dispute of material fact regarding Plaintiff's incentive-related programming theory. Plaintiff posits that had he been provided reasonable accommodations (which were necessitated by his disability), he could have adequately advocated for himself, avoided both convictions, and retained his original incentive level and access to programs. Plaintiff connects the denial of incentive-related programming to the existence of his disability. Although this argument requires a trier of fact to find for Plaintiff on several points, it is legally cogent, and Defendants have not shown that Plaintiff cannot prevail.

First, the trier of fact must find that Mr. Burke was excluded from the benefit of a meaningful disciplinary proceeding by reason of his disability (or solely by reason under the Rehabilitation Act standard). Then the trier of fact must conclude whether Plaintiff would have avoided the convictions had Defendants provided him with reasonable accommodations. Defendants' burden is to show that Plaintiff would have still been convicted at both hearings, regardless of whether he was reasonably accommodated; Defendants have not met that burden. The eventual reversal of the drug possession conviction lends credence to the notion that Plaintiff could have avoided it in the first place had he been able to meaningfully represent himself. The Post-It note conviction similarly presents a question of whether Plaintiff would have been able to avoid the conviction had he been provided reasonable accommodations. *Compare* Edwards Decl. Ex. 2, at 41 (Ms. Nofziger stating that "there was clear evidence that [Plaintiff] violated boundaries

in trying to engage a staff member in a[n] [inappropriate] relationship.")[2] *with* Burke Decl. ¶ 11 (Plaintiff describing how the whole Post-It note situation "was just a big misunderstanding" and that "the note was only one of a series of riddles . . . and had nothing to do with asking anyone out on a date").

If the trier of fact finds that Plaintiff would have avoided both convictions, had he been reasonably accommodated, this would satisfy the ADA's "by reason of disability" standard. But-for Plaintiff's disability, he would not have required accommodations, he would have been able to sufficiently represent himself, and thereby avoid the loss of incentive-level related privileges and programming. Defendants have also not shown that Plaintiff cannot meet the Rehabilitation Act's "solely by reason of disability" standard for the loss of incentive-level privileges. The trier of fact could find that Plaintiff's convictions at both hearings were solely by reason of his disability-induced inability to effectively defend himself, lacking some other factor contributing to the convictions. Although Defendants point out that the drug possession conviction was overturned for lack of evidence, the trier of fact could find that, had Plaintiff been provided accommodations, he could have himself pointed this out at the hearing and avoided the conviction—which would constitute avoidance of conviction solely by reason of disability.

Both of Plaintiff's theories (exclusion from disciplinary hearings and denial of incentive-related programming) could satisfy the regular elements of both Title II of the ADA and § 504 of the Rehabilitation Act. Summary judgment as to these claims is denied.

## B. Elements for Monetary Damages Under the ADA and Rehabilitation Act

---

[2] Defendants do not offer this "clear evidence." *See* Aggrey Decl., Ex. 101 at 1–2; Edwards Decl. Ex. 2, at 41.

i. Standard

Plaintiff also seeks monetary damages under the ADA and Rehabilitation Act. "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall*, 260 F.3d at 1138 (citing *Ferguson v. City of Phx.*, 157 F.3d 668, 674 (9th Cir. 1998)). The Ninth Circuit uses the deliberate indifference standard to determine whether a defendant intentionally discriminated. *Id*. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Id*. at 1139.

The first step of the deliberate indifference inquiry is described as follows:

> When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required . . . satisf[ying] the first element of the deliberate indifference test.

*Id*. When the public entity is put on notice, it then has a duty to act—to provide reasonable accommodations to the plaintiff. *Id*. Determining what constitutes a reasonable accommodation is a fact-specific investigation, requiring the entity to "gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." *Id*. (alteration in original) (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)). Moreover, the entity must "'give primary consideration to the requests of the individual with disabilities' when determining what type of auxiliary aid and service is necessary." *Id*. (quoting 28 C.F.R. § 35.160(b)(2)). Accordingly, the plaintiff's particular needs must be

considered when providing reasonable accommodations; "proffering just any accommodation" may not suffice. *Id.*

If an entity's failure to act is not "attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction," the second (and final) element is met. *Id.* (noting that the "failure to act," i.e., the failure to investigate and provide reasonable accommodations, "must be a result of conduct that is more than negligent, and involves an element of deliberateness") (citations omitted).

### ii. ODOC was on notice that Plaintiff required accommodations, satisfying the first element of deliberate indifference

ODOC was made aware of Plaintiff's impaired hearing and sight upon intake in 2007. Edwards Decl. Ex. 1, at 1–2. Plaintiff requested hearing aids on June 24, 2019, before his hearing, in a kyte addressed to "ADA." Aggrey Decl. Ex. 105, at 6. Plaintiff also told Mr. Golden at the beginning of both hearings that his hearing and eyesight were impaired. Edwards Decl. Ex. 3, at 48. Having received sufficient notice of Plaintiff's disability, ODOC had a duty to (1) determine what accommodations were reasonably necessary, giving deference to Plaintiff's preferred accommodations; and (2) furnish those accommodations. *Duvall*, 260 F.3d at 1139; 28 C.F.R. § 35.160(b)(2).

Whether ODOC fulfilled its duty presents questions of fact. Specifically, there are disputes as to (1) whether ODOC undertook "a fact specific investigation to determine what constitutes a reasonable accommodation[;]" (2) whether ODOC gave "primary consideration" to Mr. Burke's request for a hearing amplifier; and (3) whether ODOC's failure to act—assuming that ODOC did indeed fail to act—was a result of deliberate indifference as opposed to mere negligence. *Duvall*,

260 F.3d at 1139; 28 C.F.R. § 35.160(b)(2). A reasonable trier of fact could find for Plaintiff on all these questions.

First, a reasonable trier of fact could find that ODOC failed to conduct a sufficient factual inquiry to determine what accommodations were reasonably necessary for Plaintiff. ODOC had notice of Plaintiff's impaired vision and hearing before the disciplinary hearing, yet the extent of its factual investigation was Mr. Golden's prima facie assessment of Plaintiff's ability to participate in the hearing. *See* Edwards Decl. Ex. 3, at 48–49. A trier of fact should determine whether Mr. Golden's efforts to speak up and to hold up the paper were calculated, reasonable efforts to accommodate Plaintiff's disability.

Second, a trier of fact could also find that ODOC did not give primary consideration to Plaintiff's requested accommodations, since he requested a hearing amplifier and was not provided one. It would be reasonable to find that ODOC should have more seriously examined Plaintiff's request for hearing-amplifying technology as an accommodation.

Finally, a trier of fact could find that ODOC's failure to furnish accommodations was a result of deliberate indifference rather than negligence. Specifically, the trier of fact should determine if Mr. Golden's efforts to raise his voice and have a statement held against the glass were so plainly inadequate that he essentially made "a [considered and deliberate] decision[] not to accommodate" Plaintiff. *Duvall*, 260 F.3d at 1140. Summary judgment on this issue is precluded because of the troubling circumstances of the hearing (Mr. Burke being confined to a glass box which muffles sound); the ease with which Mr. Golden could have obtained a hearing amplifier or delayed the proceeding to determine what accommodations were necessary; and that Mr. Burke was later diagnosed as a candidate for hearing aids, suffering from "a mild loss in the low

14

frequencies sloping to a severe loss in the frequencies of both ears." Aggrey Decl. Ex. 106; Edwards Decl. Ex. 3, at 44 (Mr. Golden noting he has postponed a hearing to obtain hearing amplifiers for an AIC to ensure the AIC's meaningful participation). Mr. Golden's efforts to raise his voice and hold up a statement cannot be attributed to negligent, bureaucratic slippage. He was aware of Plaintiff's impairments and had *sole* discretion to delay the proceeding to determine if accommodations were necessary. Edwards Decl. Ex. 3, at 44, 47–48.

Because of the foregoing questions of fact, Defendants' Motion for Summary Judgment is denied as to Mr. Burke's monetary damages claims under the ADA and Rehabilitation Act.

## II. Plaintiff's Section 1983 Claims

### A. First Amendment Retaliation

Plaintiff brings claims of retaliation against Defendants Golden, Sundquist, and Weleber. His claims survive as to Defendants Golden and Sundquist, but not Weleber. "Within the prison context, a viable claim of First Amendment Retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–568 (9th Cir. 2005) (internal citations and footnote omitted).

There is no dispute that Mr. Burke engaged in protected conduct by filing over 60 grievances and writing complaint letters. Aggrey Decl. Ex. 107; Burke Decl. ¶ 16. There is also no dispute regarding whether Defendants acted to advance a correctional goal. For each Defendant the Court need only address whether there was an adverse action, whether the action was motivated by Plaintiff's protected conduct, and whether the adverse action could have chilling effect.

Plaintiff's claim against Mr. Golden survives because there is some evidence suggesting that Mr. Golden convicted Plaintiff of Drug Possession due to Plaintiff's speech. There is no dispute that the drug possession conviction constitutes an adverse action. There is also no real dispute that the penalties associated with conviction—including 90 days in disciplinary segregation, a fine, and loss of incentive level—would chill an inmate of reasonable firmness. This leaves only the question of whether Mr. Golden was motivated by retaliatory animus.

To show retaliatory animus, Plaintiff "must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1272 (9th Cir. 2009) (citations omitted). "[M]otive in . . . a First Amendment retaliation suit may be met with either direct or circumstantial evidence[.]" *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002). Here, Plaintiff does not rely on direct evidence. Circumstantial evidence from which retaliatory motive may be inferred falls into three categories: "(1) proximity in time between the protected speech and the alleged retaliation; (2) the [Defendant]'s expressed opposition to the speech; and (3) other evidence that the reasons proffered by the [Defendant] for the adverse . . . action were false and pretextual." *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002) (citing *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001)).

Plaintiff offers evidence that Mr. Golden may have convicted Plaintiff of drug possession in a pretextual manner.[3] The drug conviction was overturned on review for lack of evidence,

---

[3] Plaintiff also alleges a proximity-in-time theory, suggesting that Mr. Golden somehow brought the drug charges against Plaintiff shortly after Plaintiff began using the grievance system. Pl.'s Resp. 35. Although the temporal proximity between Plaintiff's speech and the drug possession charge is somewhat suspect, with the charge being brought four months after the drugs were intercepted and right after Plaintiff began his grievances, there is nothing to evince that Mr. Golden brought the drug possession charge or otherwise conspired to bring it about. In short, the timing of the drug possession charge cannot be attributed to any named Defendant.

suggesting that Mr. Golden may have been motivated by some other purpose, possibly a desire to retaliate. The Court notes that this is the only evidence of retaliatory animus, direct or circumstantial, but that it is sufficient to preclude summary judgment. *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985) (explaining that "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder").

Plaintiff's claim against Mr. Sundquist survives because Plaintiff has shown evidence of an adverse action and retaliatory animus. The first issue is determining whether Mr. Sundquist took adverse action against Plaintiff. In the prison context, determining whether the Defendant took an adverse action requires the Court to ask whether "the record, taken in the light most favorable to the plaintiff, reveals statements by the defendant that a reasonable factfinder could . . . interpret as intimating that some form of punishment or adverse regulatory action would follow." *Brodheim*, 584 F.3d at 1270 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003)). An implicit threat of harm can be an adverse action. *Id.* In *Brodheim*, there was an implicit threat of harm when the defendant corrections officer responded to plaintiff inmate's grievance with a note that in part said: "I'd also like to warn you to be careful what you write, req[u]est on this form." *Id.* at 1265–66, 1270 (alteration in original). The court elaborated that this implicit threat posed a real risk of harm, since "[t]here were a number of things that [defendant], as a corrections officer, could have done if [plaintiff] failed to comply with his warning that would have had a negative effect." *Id.* at 1270.

Here, Mr. Sundquist stated he "encouraged [Plaintiff] to stop sending k[y]tes." Edwards Decl. Ex. 4, at 29. In light most favorable to Plaintiff, Mr. Sundquist's "encouragement" could

have been an intimidating threat. Mr. Sundquist, as the Security Threat Manager for OSP, conceivably could have acted against Plaintiff resulting in a negative effect.

Plaintiff also offers circumstantial evidence that Mr. Sundquist acted with retaliatory animus. As stated previously, a defendant's expressed opposition to protected speech serves as circumstantial evidence of retaliatory animus. *Allen*, 283 F.3d at 1077 (citing *Keyser*, 265 F.3d at 751–52). Here there is a clear nexus between Defendant Sundquist's warning to Plaintiff and Plaintiff's speech, since Defendant Sundquist told, (in his words, "encouraged"), Plaintiff to stop filing grievances. Edwards Decl. Ex. 4, at 29. In light favorable to Plaintiff, Mr. Sundquist's comment to Plaintiff suffices as reasonably inferred opposition to Plaintiff's speech. *See Brodheim*, 584 F.3d at 1271.

The last issue is whether Defendant Sundquist's warning would chill an inmate of ordinary firmness. This Court cannot proclaim as a matter of law that a conversation between a security threat manager and an inmate, wherein the inmate is encouraged to stop filing grievances, would not have a chilling effect. *See id.* at 1265–66, 1271 (refusing to hold as a matter of law that a corrections officer's warning to an inmate would not have a chilling effect).

Plaintiff has not provided evidence of retaliation by Defendant Weleber. Although Plaintiff alleges in his First Amended Complaint that Ms. Weleber threatened to have him confined for mental health reasons, nothing in the record suggests such an event occurred. FAC ¶ 57.

## B. Fourteenth Amendment Due Process

### i. Plaintiff's confinement could implicate a liberty interest

Plaintiff alleges Due Process violations by Defendants Ventura and Yoder under a supervisory theory of liability, and by Defendants Eriksen and Golden[4] under a direct theory of liability. For direct liability claims, Plaintiff must show: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Board of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

As a threshold, Plaintiff's change in confinement could have implicated a liberty interest. "Under *Sandin* [*v. Conner*], a prisoner possesses a liberty interest . . . when a change occurs in confinement that imposes an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Whether a hardship is "atypical and significant" is addressed on a "case by case, fact by fact" basis. *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (internal citations and quotation marks omitted). To determine if a hardship is atypical and significant, courts consider "whether the challenged condition mirrored those conditions imposed on inmates in administrative segregation and protective custody; the duration of the condition, and the degree of restraint imposed; and whether the state's action will invariably affect the duration of the prisoner's sentence." *Johnson v. Ryan*, 55 F.4th 1167, 1197 (9th Cir. 2022) (cleaned up) (citing *Brown v. Oregon Dept. of Corrections*, 751 F.3d 983, 987 (2014)).

A significant change in the underlying conditions of confinement implicates a liberty interest. *Johnson*, 55 F.4th at 1198. In *Johnson*, the plaintiff inmate was moved from close-custody to maximum security. *Id.* In close-custody, inmates had to remain separate from each other during

---

[4] Defendants do not make arguments concerning Mr. Golden, but Mr. Golden remains a party to this case, as he is named in Mr. Burke's Amended Complaint, and the Court did not dismiss him in its prior Opinion and Order. *See* Am. Compl. 17; ECF No. 22.

meal and recreation times, but had double-cell housing, more freedom to work, and could move about the prison without full restraints. *Id.* In maximum security, inmates were separated for meals and recreation like the inmates in close-custody, but otherwise faced harsher conditions, including single-cell housing, more limited work opportunities, full restraint when moving about the prison, and strip searches every time they left their cell. *Id.* at 1197–98. Accordingly, the court held that there was an atypical and significant hardship when the plaintiff was moved from close-custody to maximum security because the underlying conditions of maximum security were significantly harsh relative to close-custody confinement. *Id.* at 1198.

The amount of time spent in, and the qualitative conditions of, the new confinement should be considered when calculating whether the new confinement imposes an atypical and significant hardship. *Id.* at 1197. In one case, the Ninth Circuit found that an inmate's confinement to an intensive management unit for 27 months "imposed an atypical and significant hardship under any plausible baseline." *Id.* (noting that the conditions of the intensive management unit were "generally . . . similar to conditions in the [disciplinary segregation unit]"). Where the conditions of the confinement are harsher, less time in that confinement is needed to implicate a liberty interest. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003). To illustrate, the Ninth Circuit found that a liberty interest was implicated when a disabled inmate was committed to two months in segregation without his wheelchair, forcing him to crawl around with his arms. *Id.*

A liberty interest may have been implicated when Plaintiff was moved from general population to disciplinary segregation. Plaintiff was in disciplinary segregation for 120 days, during which he was allegedly not provided a pillow for two months, slept on a "severely worn-out mattress," and did not have a hearing amplifier. Burke Decl. ¶¶ 13–14; *see* Aggrey Decl. Ex.

102, at 3 (noting that Plaintiff will "return to general prison population housing"). In light favorable to Plaintiff, the lack of a pillow and use of a worn-out mattress caused Plaintiff "a great deal of pain, because Stickler's Syndrome affects [Plaintiff's] joints, bones, and connective tissues." Burke Decl. ¶ 13. The Court then cannot proclaim as a matter of law that no liberty interest was implicated; there is a factual question pertaining to the qualitative harshness of the conditions of Plaintiff's confinement in DSU, and whether 120 days in those conditions would constitute an atypical and significant hardship.

### ii. Direct liability claims against Mr. Golden and Mr. Eriksen

Because there is a question of fact as to whether Plaintiff faced an atypical and significant hardship, the Court next turns to whether Plaintiff was denied adequate procedural protections. *Brewster*, 149 F.3d at 982. Where a liberty interest is at stake, a prisoner must be afforded certain procedures in disciplinary proceedings. *Wolff v. McDonnell*, 418 U.S. 539, 563–64, 566 (1974). These include "written notice of the claimed violation[;]" a written statement containing the "evidence relied upon" and the "reasons for the disciplinary action taken[;]" and the opportunity to call witnesses and present evidence in their defense, so long as it is not "unduly hazardous to institutional safety or correctional goals." *Id.* Additionally, where the prisoner is illiterate or where the issue is complex, such that "the inmate will [not likely] be able to collect and present the evidence necessary for an adequate comprehension of the case," the inmate should be afforded aid from a fellow inmate, staff, or a "competent inmate designated by staff." *Id.* at 570. Last, *Wolff* guarantees the right to an impartial tribunal. *Id.* at 571.

Plaintiffs first direct liability claim is against Defendant Golden. The claim rests upon theories that Plaintiff was (1) not provided with notice of the charges; (2) unable to present a

defense; and (3) was convicted as a result of bias and without evidence sufficient to convict. Pl.'s Resp. 24–28. Regarding the lack of notice of the charges, Plaintiff states that he was not provided with notice of the drug charges until after the hearing. Burke Decl. ¶ 12. Defendants have not contested Plaintiff's assertion. The failure to provide notice of the charges before a hearing constitutes a *Wolff* violation. *Wolff*, 418 U.S. at 563. However, Plaintiff has not stated who deprived him of notice of the charges. As such, the failure to provide Plaintiff with notice of the charges is not attributable to Defendant Golden.

Plaintiff's second theory posits that Defendant Golden denied Plaintiff the opportunity to present a defense when he failed to provide reasonable accommodations to Plaintiff, which would have otherwise ensured Plaintiff's meaningful participation. The Court finds this theory plausible. Due process is violated when an inmate is denied the opportunity to present a defense. *See Edwards v. Balisok*, 520 U.S. 641, 646 (1997) (Deni[al] [of] the opportunity to put on a defense . . . is an obvious procedural defect"); *cf. Wolff*, 418 U.S. at 571 (holding that lack of an impartial tribunal violates due process requirements); *Wolff*, 418 U.S. at 570 (holding that the failure to provide aid to an inmate constitutes a due process violation where it is unlikely that the inmate will be able to adequately comprehend the case without aid, such as where the inmate is illiterate or the where the issue is complex). As discussed above, there are questions of fact regarding whether Mr. Golden provided reasonable accommodations, whether Plaintiff understood the proceedings, and whether Plaintiff was able to sufficiently represent himself. In answering these questions, the trier of fact could find that Defendant Golden effectively denied Plaintiff the opportunity to defend himself due to the failure to provide reasonable accommodations, which would constitute a violation of due process. Since Plaintiff's claim against Defendant Golden survives, the Court need not address Plaintiff's theory of bias and insufficient evidence.

Plaintiff's claim against Defendant Eriksen must be dismissed because the record does not indicate that Defendant Eriksen contributed to any procedural defects. Although Plaintiff alleged that Defendant Eriksen denied Plaintiff's requested accommodations, the record belies this assertion, showing that Defendant Eriksen explained to Plaintiff how to get accommodations, and that he did not see Plaintiff's original request because he was on vacation. *Compare* FAC ¶ 38, *with* Aggrey Decl. Ex. 105, at 1, 3–6.

### iii. Supervisory liability against Ms. Ventura and Mr. Yoder

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). Regarding the latter, a causal connection is established if the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (cleaned up). Additionally, a supervisor may be individually liable "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d at 1208)).

Plaintiff's supervisory claim against Defendant Ventura survives summary judgment, but hinges on whether Mr. Golden is directly liable. Defendant Ventura reviewed the audio for both disciplinary hearings, upholding the Post-It Note conviction and overturning the Drug Possession

23

conviction for lack of evidence. If Defendant Golden did fail to provide adequate procedural protections to Plaintiff, then the trier of fact should determine whether Defendant Ventura acquiesced in Defendant Golden's unconstitutional conduct when she reviewed the hearings' audio and failed to cure the constitutional deprivations.

Plaintiff's claim against Defendant Yoder must be dismissed because no evidence has been offered to show that Defendant Yoder was aware of the potentially unconstitutional conduct. Plaintiff alleges that he wrote a kyte to Defendant Yoder describing how he was unable to participate in the disciplinary proceedings, and that Defendant Yoder responded, dismissing Plaintiff's concerns. FAC ¶¶ 54–55. Plaintiff also alleges that Defendant Yoder failed to investigate Plaintiff's claims of ADA and due process violations. *Id.* at ¶ 97(e). However, there is nothing in the record demonstrating that Defendant Yoder knew about the alleged conduct.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 56, is DENIED.

IT IS SO ORDERED.

DATED this 25th day of September 2025.

                                _____s/Michael J. McShane_____
                                      Michael McShane
                                  United States District Judge